(No. 25060.—■■■■■■■■■■)
The People of the State of Illinois, Defendant in Error, *vs.* James W. Crabb, Plaintiff in Error.

*Opinion filed October 10, 1939—Rehearing denied Dec. 14, 1939.*

348

Shaw, J., dissenting.

Hal M. Stone, H. Leonard Jones, and W. J. Reardon, for plaintiff in error.

John E. Cassidy, Attorney General, Rayburn L. Russell, State's Attorney, A. B. Dennis, William G. Worthy, and Harold H. Kuhfuss, for the People.

Mr. Chief Justice Wilson delivered the opinion of the court:

James W. Crabb was tried and convicted by a jury in the circuit court of Tazewell county for the crime of perjury and sentenced to imprisonment in the penitentiary. He has sued out this writ of error and the record is now before us for review.

The indictment consisted of five counts which charged, generally, that Crabb testified falsely under oath at the coroner's inquest upon an inquiry into the cause of the death of his wife, Betty Collison Crabb, who was killed by a bullet wound inflicted between 2 :00 and 3 :00 o'clock in the morning of March 1, 1938. There is much testimony relative to the occurrences in the Crabb home, immediately before, at the time of, and subsequent to the firing of the shot which resulted in the death of defendant's wife. The

evidence, as summarized, tends to establish that upon the return of the defendant and his wife from a party, at which there had been much drinking, they created considerable noise, disturbance and confusion. The defendant and his wife, and defendant's father and stepmother all resided in the same house. During the course of the disturbance the defendant and his father engaged in an argument and the latter ordered his son to go to bed, at the same time telling him if he did not do so he would call a police officer. This, he later did. The elder Crabb and his wife then returned to their own room. Two police officers summoned by the elder Crabb reached the house and were talking with the defendant's father when a shot was fired. The officers then proceeded upstairs to the bedroom of the defendant's wife where they found her in a dying condition as the result of a bullet wound. Apparently someone, after the shooting, called the sheriff, who proceeded to the Crabb residence and after a search of the room occupied by defendant and his wife found a revolver wedged between the mattress and the headboard of the bed, with the barrel pointing downward. The sheriff removed the revolver and wrapped it in a handkerchief so that it might be examined for fingerprints, but so far as the evidence discloses none were found. A *post-mortem* examination was performed which disclosed that Betty Crabb was killed by a bullet wound.

On March 8, the defendant was examined as a witness before the coroner's inquest, in the course of which he stated under oath that he was in the bathroom at the time the bullet was fired and that upon returning to the bedroom found that his wife was shot. He testified that he saw no revolver at the time although he had seen one in the house the day before the tragedy. He also stated that he did not know who placed the revolver between the mattress and the headboard of the bed. After the hearing at the coroner's inquest a warrant was sworn out charging the defendant with the murder of his wife. This warrant, dated March 12, 1938, contained the usual commands to the effect

that the defendant, when arrested, should be brought without any unnecessary delay before the magistrate to answer to the charge of murder. The defendant was not taken before the magistrate as commanded in the warrant but instead was taken to the quarters of the sheriff who lived at the county jail and there detained until the morning of March 14. He was not permitted to consult with counsel nor with his father and mother, whom he requested to see, until after the statement was obtained. During his detention in the quarters of the sheriff at the county jail he was questioned by the State's attorney, the sheriff, and representatives of the State Bureau of Identification. Present, also, at the time, were a stenographer, the coroner, and a deputy sheriff. From 1:00 o'clock noon until 8:00 o'clock in the evening, during one of the days while detained, he was subjected to questioning and cross-questioning by the various persons present or by some one of them. These questions and answers, or part of them, were subsequently reduced to writing and the defendant was asked whether he was willing to sign. This, he refused to do. The questions and answers, as contained in the statement offered in evidence as the People's exhibit 12 varied as to the facts from those stated by the defendant upon the witness stand before the coroner's jury, and it is upon this variation of the facts that the present indictment of perjury is founded.

There is, in the record, no direct evidence of perjury other than defendant's testimony at the inquest and this unsigned statement. It becomes important to consider this statement, together with all the surrounding circumstances at the time it was made, for the purpose of ascertaining its weight and materiality. The defendant takes the position that exhibit 12, the statement in question, was a confession or so nearly akin to one as to warrant the trial judge in making an investigation in order to ascertain whether it was voluntary or involuntary, and, further, that he was entitled to have all the facts which surrounded the taking

of the statement before the jurors when they came to consider its weight. It is the People's position that this is not a confession but was an admission against interest and was an exculpatory statement as to the murder charge alone. There is no question but what if this cause were being heard on the charge of murder the surrounding circumstances might be shown. The charge, however, being one of perjury, it is the People's position that a different situation obtains. While it is true that the statement denied, in effect, the charge of murder, it still contained facts which might result in an indictment for manslaughter. In procuring the statement it appears to have been the purpose to obtain a confession. This is brought out by the fact that the State's attorney advised the defendant of his constitutional right to not answer any questions which he thought might incriminate him. The statement contained answers made by the defendant which were directly and substantially different from the testimony he had given before the coroner. He stated that he had some drinks at the party and was feeling them, and upon reaching home he and his wife prepared for bed; that there was an argument between himself and his father; that later he went to his room and picked up a revolver, went around the bed to the hallway where he brandished the weapon and then returned to the bedroom; that his wife was sitting up in the bed and while he was standing at the foot she leaned over and grabbed the gun and it was discharged; that his wife fell back and he became frightened and muddled and put the gun in the clothes closet in the bedroom; that he later took the revolver from the closet, wiped it off and placed it between the mattress and the head of the bed.

At the time of these occurrences the defendant, according to his own testimony, was twenty-one years of age. Exhibit 12, the statement in question, was obtained from the defendant after prolonged interrogation by five different persons and in the presence of three others. According

to an affidavit made by the defendant he had asked permission to see his attorney after his arrest, but was denied that right. The statement was not signed by the defendant and he requested that his parents be allowed to see it before he would do so. To that extent the statement was not without reservation. There was testimony to the effect that at the end of the interrogation he was tired and appeared to be weak and in a dazed condition. The defendant offered to show by witnesses that there were a great number of people surrounding the jail during the time of his questioning. This offer of proof was refused. Testimony was offered and refused which would have shown efforts of the mother of the defendant to contact her son while he was being interrogated. The State's attorney not only owes a duty to the people of his county and to the State, but also to the defendant, and under the circumstances it would appear that the proper procedure of this officer would have been to see that the defendant was returned in accordance with the warrant to the judicial officer who issued it, or, in his absence, to some other magistrate, in order to give the defendant his rights under the law to bail if the facts failed to disclose a case of murder where the proof is evident or the presumption great. *People* v. *Frugoli,* 334 Ill. 324; Criminal Code, Ill. Rev. Stat. 1937, chap. 38, pars. 609, 660, 664.

No effort was made by the People to prove the statement other than by the stenographic report, and two witnesses, although there were four or five others present at the time who were easily accessible. Counsel for defendant attempted to have the trial court require a preliminary examination of the parties present at the time of the taking of the statement, together with the facts surrounding it, which was denied. Under the circumstances of this case such a preliminary examination should have been held prior to the admission of exhibit 12 in evidence. (*People* v. *Fox,* 319 Ill. 606; *People* v. *Sweeney,* 304 id. 502; *Tuttle* v.

*People,* 33 Colo. 243.) Even though exhibit 12 was admitted in evidence without a preliminary hearing we are of the opinion that there were facts surrounding the interrogation which would justify the court in admitting such facts in evidence. This, for the purpose of permitting the jury to give such weight to the statement as it considered important under all the surrounding facts and circumstances under which it was given. *People* v. *Fox, supra; People* v. *Gukouski,* 250 Ill. 231.

While it is true that a warrant was issued in this case, it also appears that the defendant was not returned to the magistrate who issued it, but was held *incommunicado* by the officers of the State before complying with the warrant. In our opinion, this is as much an abuse of process as it would have been if he had been detained without a warrant. This fact was a proper one for the consideration of the jury and was one of the circumstances which should have been admitted in evidence for its consideration. As was well said in *People* v. *Vinci,* 295 Ill. 419: "In determining whether or not a confession was made voluntarily, it is proper to take into consideration unlawful restraint." The age of the defendant, the constant grilling of cross-examiners, the refusal to permit defendant the right to talk with counsel and his parents, together with the alleged fact that there was a milling crowd outside the jail, and other circumstances, are such as to impel us to the conclusion that the jury was entitled to consider the surrounding circumstances in connection with the alleged statement.

We are of the opinion that justice will be best conserved by a new trial in accordance with the views expressed herein. The judgment is, therefore, reversed and the cause remanded to the circuit court of Tazewell county for a new trial.

*Reversed and remanded.*

Mr. JUSTICE SHAW, dissenting.