**Application of E. L. (Lefty) FOWLER for Writ of Habeas Corpus.**

**No. A–12790.**

Court of Criminal Appeals of Oklahoma.

Nov. 7, 1960.

John L. Smith, Oklahoma City, for petitioner.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for respondent.

BRETT, Judge.

This is an original action for writ of habeas corpus brought by E. L. (Lefty) Fowler seeking release from the penitentiary from a life sentence for the murder of Helen Beavers. The murder was com-

mitted in Duncan, Stephens County, Oklahoma, on January 23, 1948. Helen Beaver's body, badly beaten, was found in the turtle back of an automobile belonging to a party not connected with the crime. The body having been placed there by the petitioner. Lefty Fowler, at the time of the murder was a Duncan policeman. He confessed the crime, was tried and convicted by a jury in Stephens County and sentenced to life imprisonment. It appears from the record before us that this murder was needless and brutal and that defendant's guilt was established contrary to due process and that the entire proceedings is void.

Petitioner alleges in his petition, in substance, that the judgment and sentence entered against him is illegal and void since it was obtained contrary to his Constitutional and Statutory rights. Specifically, he asserts that his arrest was affected by means of fraud and conspiracy and that his detention was effected through the denial of his statutory right to be taken before the nearest magistrate, as well as by a denial of his right to Habeas Corpus. He further alleges that the confession relied upon for his conviction was obtained by duress and fear and through mental oppression and threats of bodily harm and torture. He asserts that the admission into evidence of the invalid confession and the hereinbefore enumerated official maledictions to which he was subjected constituted a denial of his Constitutional and Statutory rights to "due process." It is well to observe that no appeal was perfected in this case and the matter is here before us on Habeas Corpus.

It appears from this record in Habeas Corpus that petitioner Fowler had been a policeman in Duncan, Oklahoma, for about 4 months prior to the commission of the Beaver's murder. The petitioner suddenly resigned from his position shortly after the death of Helen Beavers. After his hasty resignation he failed to return to pick up his check and engaged in conversation which indicated that he was entertaining the idea of suicide. He began a round of excessive drinking and on one occasion upon arrest by an officer in Waurika, Oklahoma, he bared his breast and invited the officer to shoot him. This and other demeanor indicated to the officers who were investigating the murder that he was in a disturbed state of mind. It was discovered also that he had been with Helen Beavers a short time before she was killed. On March 14, 1948, petitioner was arrested in Waurika, Oklahoma, and imprisoned for drunkenness in the Jefferson County jail.

Briefly, the official conduct complained of by the petitioner consisted of the following matters and acts. It is not denied that several peace officers entered into an agreement in violation of law to effect his removal to Duncan, Oklahoma, on a bogus charge, and to imprison him in the Stephens County jail. In this regard the County Attorney's affidavit discloses the facts. Three Crime Bureau Agents unknown to the petitioner Fowler were dispatched from headquarters in Oklahoma City, to consummate the plan. It was decided that one of the Bureau agents should be placed in jail with Fowler posing in an apparent drunken condition and smelling strongly of liquor. The Bureau agent was to effect a deal with another Bureau agent who was to pose as an attorney come to pay the imprisoned agent's fine, and also the fine of Fowler, and thereby obtain their release. In this way they would gain Fowler's confidence. But this was to be done on condition that Fowler would agree to drive his supposedly drunk cellmate to Chickasha, Oklahoma. Fowler agreed to the conditions, his fine was paid, and he was released from jail. The hitch in this arrangement was that the cellmate of Fowler, also being held on a drunkenness charge, did not disclose to him that the car to be used belonged to the County Attorney's father-in-law, which during the trip to Chickasha would at the proper time be stopped and would be represented as a stolen car. Participating and co-operating in this scheme were certain police officials in Waurika, including the unsuspecting city Judge (who later became petitioner's defense counsel). Fowler then proceeded to

drive the automobile toward Chickasha, Oklahoma, but when about 4½ miles south of Duncan he was stopped by a third Bureau agent, arrested on the bogus charge of reckless driving and suspicion of possession of a stolen automobile (none of these charges were ever filed). When the arrest of Fowler was affected on the highway, according to Fowler's testimony, his supposed friend and benefactor riding with him tried to get him to run in an effort to escape (the object of this endeavor is not difficult to fathom—he would have probably been shot or at least shot at, in order to soften him up for the star chamber proceedings to be thereafter pursued). The petitioner did not run and no untoward event occurred at that particular time. Thereafter, he was placed in custody of the arresting Bureau agent and taken to Duncan and immediately placed in the Stephens County jail and held for investigation. No charges of any kind were lodged against him (the reason of course is apparent).

Fowler was thus lodged in the jail of Stephens County on sheer suspicion for investigation and without complaint against him on March 17, 1948. After being in jail for 2 or 3 days held incommunicado, petitioner requested his father (a Waurika constable and peace officer for many years) and petitioner's wife be informed of his imprisonment. They were so informed and came to see him. Petitioner told his father that he was being held for the murder of Helen Beavers. Bill Fowler, the father, stated that he would have to do his best to defend his son. On March 24, 1948, it became apparent to the officers in charge of the investigation that there might be interference by representatives of the public press and by certain officials of Duncan, Oklahoma. Up to this time petitioner's father had not intervened in his defense. Strangely coincidental to these circumstances, it was then decided, according to the County Attorney, to remove Fowler to the jail of Grady County at Chickasha, Oklahoma, as he put it, "because I was unable to let certain officials here in Duncan

know what we were doing without receiving the publicity and interference of those persons." But the then director of the Crime Bureau said, "This was done to keep newsmen away, and too, we were expecting a Habeas Corpus to be filed any minute. This we were trying to prevent until we had thoroughly investigated lefty." The record discloses that on the 24th. day of March petitioner's counsel, whom his father had employed, tried to see him and was told that he could not since Fowler was being investigated and besides that he was not in the jail. On the question of holding persons for investigation, it has been aptly stated in Carter v. Southern Limited, 303 Ill.App. 502, 25 N.E.2d 590, 592:

"We wonder if some public officials really believe that they have the right, in violation of the Constitution and law, to subject citizens to the treatment received by plaintiff herein. Do they not know that they have no right to arrest a person without a warrant unless they either see a crime committed or know that a crime has been committed and have reason to believe the accused is the guilty party? Do they not know that their duty is to take the person so arrested before a magistrate; that they have no right to make a defendant 'talk'; that the so-called 'investigation' cannot be held pursuant to the law in making the defendant a witness against himself or herself; that the presumption of innocence is still one of the cherished rights of citizenship; that the condition or state of any official's mind, whether suspicious or otherwise, would not justify acts which would unlawfully deprive such citizen of his or her liberty or to compel such person to 'talk' against his or her will?"

This matter did not stop with what this court has held is legitimate detention, Hendrickson v. State, 93 Okl.Cr. 379, 229 P.2d 196. Thacker v. State, Okl.Cr., 309 P.2d 306, without unnecessary delay before taking the person in custody to the nearest magistrate. The evil herein is that the

detention passed beyond legitimacy and degenerated into inquisition, as was true in Benton v. State, 86 Okl.Cr. 137, 190 P.2d 168.

It is apparent from this record that without a charge being lodged against him, petitioner was held for 12 days during which time he was subjected to intensive grilling by as many as 7 officials individually and collectively. During this grilling the petitioner implicated another officer, Wallace Sparks, petitioner's partner on the police force. Sparks was contacted and confronted with this information and it was arranged to have him brought to Chickasha and placed in the interrogation room alone with Fowler, the petitioner. What this innocent, unjustly accused officer may have said to him could produce the wildest of imaginative speculation. The record is silent as to what transpired therein, but it was immediately thereafter that Fowler changed his story and confessed. The County Attorney thought the story was inconsistent in some details and it was checked. On March 25, 1948, after talking to him for a short time he again gave the County Attorney a statement which is called the second confession. This confession bears the notation that it was concluded and signed "at the hour of 5 O'Clock A.M." naming as witnesses the County Attorney, two Bureau agents, and the County Attorney's stenographer. It is not unreasonable to conclude that this statement represented the fruits of an all night grilling after his encounter with officer Sparks, who undoubtedly "put the heat" on petitioner resulting in his confession. This statement was not satisfactory and on the evening of March 26, 1948, the County Attorney returned and obtained another statement which he said was more plausible and more in detail. The County Attorney related that this statement was not reduced to writing but that petitioner was told that he would return the next day and reduce the statement to writing.

On the morning of March 27, 1948, the final confession was taken in shorthand by two competent stenographers and transcribed and signed by petitioner, Lefty Fowler. The stenographer's notes and transcriptions were practically identical in detail.

The petitioner's father was not advised of his son's removal to Chickasha where he was held for 5 days incommunicado prior to what the County Attorney called a sufficient confession, but the father didn't know and could not ascertain his whereabouts until after the confession had been obtained. The father together with a minister thereafter was permitted to see him. The minister, who had not known the Fowlers prior thereto, swore in his affidavit that when he saw petitioner that petitioner was badly shaken, was in tears, though he bore no marks, and according to the minister, said that he had confessed for fear of his life and from fear of torture. By means of the denial of the right to counsel at all stages of the proceedings, including the period of investigation, the failure to charge him with murder and take him before the nearest magistrate as provided by law, his removal to avoid habeas corpus proceedings, constitutes coercive custody. That conduct, together with threats against his life, and of torture, effected mental duress, broke his resistance, and wrung from him an involuntary confession. The object of his removal to Grady County, Oklahoma, where he was held incommunicado until after the confession was extracted, having served its unlawful purpose, the petitioner was thereupon returned to the Stephens County jail where on March 29th, 1948, he was charged with the murder of Helen Beavers. A substantial part of the details of the foregoing have been lifted from the County Attorney's fair and frank affidavit and from the truthful statement of the then director of the Crime Bureau, when he stated the object of the officer's removing petitioner to Grady County jail. Although these officers are to be censored for denying petitioner his Constitutional and Statutory rights, they

are to be commended for their truthfulness.

The fact the former county attorney and the former director truthfully admitted the controlling facts of the case constitutes the turning point in favor of the petitioner, otherwise, we would have applied the doctrine of laches in this case as follows:

> "The right to relief by habeas corpus may be lost by laches, when the petition for habeas corpus is delayed for a period of time so long that the minds of the trial judge and court attendants become clouded by time and uncertain as to what happened, or due to dislocation of witnesses, the grim hand of death and the loss of records, the rights sought to be asserted have become mere matters of speculation, based upon faulty recollection, or figments of imagination, if not out-right falsifications." Ex parte Matthews, 85 Okl.Cr. 173, 186 P.2d 840, 841, certiorari denied; Matthews v. Burford, 333 U.S. 858, 68 S.Ct. 728, 92 L.Ed. 1138; Ex parte Ray, 87 Okl.Cr. 436, 198 P.2d 756.

These are the facts upon which the petitioner contends denial of his Constitutional due process and the loss of his statutory rights. The Constitution of the United States, 14th. Amendment § 1, provides as follows:

> "No State shall * * * deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article 2 § 7 of the Constitution of Oklahoma reads as follows:

> "No person shall be deprived of life, liberty, or property, without due process of law."

And in Article 2 § 10 of the Oklahoma Constitution:

> "The privilege of the writ of habeas corpus shall never be suspended by the authorities of this State."

Then in Article 2 § 20 of Oklahoma Const., the pertinent part referring to when a person is arrested:

> "He shall have the right to be heard by himself and counsel * * *."

Under the applicable statutes of Oklahoma, 22 O.S.A. § 196, a person may be arrested without a warrant as follows:

> "2. When the person arrested has committed a felony, although not in his presence. 3. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it. 4. On a charge, made upon reasonable cause, of the commission of a felony by the party arrested. (R.L.1910, § 5654)."

In 22 O.S.A. § 199 the statute reads as follows:

> "When arresting a person without a warrant, the officer must inform him of his authority and the cause of the arrest * * *."

And in 22 O.S.A. § 181:

> "The defendant must, in all cases, be taken before the magistrate without unnecessary delay."

21 O.S.A. § 534 reads:

> "Every public officer or other person having arrested any person upon any criminal charge, who wilfully delays to take such person before a magistrate having jurisdiction to take his examination, is guilty of a misdemeanor."

And 21 O.S.A. § 835 reads in part as follows:

> "Every person having in his custody or power, or under his restraint, a party who by the provisions of law relating to habeas corpus, would be entitled to a writ of habeas corpus * * who with intent to elude the service of such writ, to avoid the effect thereof, transfers the party to the custody, or places him under the power or control of another, or conceals or changes the place of his confinement, or who, without lawful excuse * * * is guilty of a misdemeanor. R.L.1910, § 2394."

The foregoing Constitutional and Statutory provisions are clear and unmistakable limitations upon those vested by law

with the power of arrest and detention. Those provisions are designed to protect the individual in his right to due process of law. The penalties provided for violation of some of them constitute legislative expression of their fundamental character and of the importance placed upon them. This case falls squarely within the prohibitive purview of all the foregoing Constitutional and Statutory provisions. One need be neither sage nor seer to apply the law in this case. This defendant was brought to justice by the most malevolent methods. From its very inception the plan reeked with official conspiracy to violate the law, and to practice fraud and deception upon the petitioner. While we hold no brief for this officer of the law who through some inexcusable urge, fell from the high estate of defender of the law to the low estate of an indefensible killer, the tenets of the law require us to look at such matters in a purely impersonal attitude. Even though he is not an ignorant, illiterate man and as an officer, was well versed in his rights as to aid of counsel, we cannot overlook the illegality of official conduct in the denial of his fundamental rights, which he was in no position to assert while being held incommunicado. To do so in this case would place our approval on the iniquitous methods employed in acquiring custody of this petitioner and give acquiescence to his long detention without aid of counsel, and without taking him before the magistrate, sanction the abrogation of the great writ of Habeas Corpus by means of incarceration in another county jail, and approve a confession obtained by sweat-box procedures, all of which have been heretofore repudiated. Benton v. State, 86 Okl.Cr. 137, 190 P.2d 168, 177. If officers of the law can violate the law according to their own good pleasure for 12 days or until a confession has been extracted, as was done herein, what is to prevent them from abrogating the operation of Habeas Corpus indefinitely, particularly in the case of one bereft of friends and without family connections? We must take the long view of such situations. They must be viewed not just as an isolated individual matter, but the effects must be viewed as a link in a long chain of legalistic reaction. We must protect the individual's fundamental rights whether he be a fallen officer or a habitual felon. We cannot ignore the rights of some of the people without doing violence to the rights of all. The foregoing Constitutional and Statutory provisions are not just idle gestures in the law, but are positive elements enacted to prevent just such violations of due process as are herein involved. They are safeguards designed to assure an accused due process of law. They are in fact bulwarks against the establishment of a police state—to avoid fake arrests, false imprisonments, abrogation of the writ of habeas corpus, and the use of sweat-box methods to obtain confessions. When an arrest is effected as hereinbefore related, imprisonment maintained, and a confession is extracted in clear violation of unmistakable provisions of law, on the asserted basis of defeating the right to habeas corpus, such conduct by the officers constitutes a clear denial of due process of law. Benton v. State, supra. We assert the law to be that where officers of the law, falsely arrest an accused, deny aid of counsel in violation of the statutes by refusing to take him without unnecessary delay before the nearest magistrate (whom it is presumed would provide such aid, but instead violate the law by removing him from the jurisdiction of the arrest to another county seat jail for the express purpose of defeating the right to habeas corpus, and there extract a confession from the accused by sweat-box methods, the incident confession is inadmissible in evidence and the proceedings leading thereto are all contrary to due process and amount to the denial of a fundamental right and constitute grounds for release in a proceeding in habeas corpus. This situation is very similar to that pertaining to Benton v. State, supra, wherein the procedure therein pursued was in many respects akin to that followed in the case at bar. Benton was held 20 days in-

communicado, and moved from one jurisdiction to another and subjected to coercive treatment in the denial of due process to obtain his confession. Therein we said:

"The uncontradicted evidence in this record discloses that the defendant was denied the right to counsel in all stages of the proceedings from the date of his arrest on May 22 to June 11th, the date the charge of murder was filed against him. Such denial constitutes a violation of both the State and Federal constitutions. In Sutton v. State, 35 Okl.Cr. 263, 250 P. 930, 933, this court quoting from Polk v. State, 26 Okl.Cr. 283, 224 P. 194, said: 'Under our laws every person accused of felony is entitled to aid of counsel at every stage of the proceedings, whether imprisoned or admitted to bail, and refusal of opportunity to procure such counsel amounts to a deprivation of a right essential to his safety.' In Howington v. State, 30 Okl.Cr. 243, 235 P. 931, 933, this court said: 'A denial of a constitutional right to a person prosecuted for a crime is prima facie prejudicial.' * * * This constitutional right to counsel clearly imports the right to aid thereof upon arrest and during the inquisitorial proceedings when the confession was taken. It is not limited to aid of counsel at the time of the preliminary or the trial. The law clearly provides that an accused shall be entitled to the aid of counsel at every stage of the proceedings and a refusal of opportunity to procure such counsel amounts to a deprivation of a right essential to his safety and constitutes the denial of a sacred constitutional right. * * * Such a right was sacred, not only to this defendant, but must be preserved to every citizen of this state and of the United States, and, officers of the law must be required to regard it with that high degree of sanctity in which it is held by the people and the judiciary throughout the land. * * *"

Certainly the methods employed herein were coercive and a denial of due process will not be tolerated when called to our attention in a proper proceeding. See in this connection People v. Kirkpatrick, 413 Ill. 595, 110 N.E.2d 519, 520, wherein that court held that it was a denial of Constitutional due process to hold Kirkpatrick for three days and move him from place to place for interrogation and without the aid of counsel. Therein the court said:

"Plaintiff in error was taken into custody by police officers of the city of Canton about 10:30 P.M. on March 23, 1951. He was placed in the Canton jail and then removed to the Fulton County jail in Lewistown. He was awakened early the next morning by the chief of police of Macomb and taken to Macomb where he was housed in the city jail. During the day he was questioned by State's Attorney Hayes, and the Macomb chief of police, Eddie Setzer. That evening he requested of Hayes that he be permitted to see an attorney. The next day he saw only officers. The following day, March 26, he was taken to Springfield early in the morning, arriving there about 8:00 A.M. In Springfield he was housed in an 'interrogation room' in a building used for investigation. The record fails to disclose the reason or necessity for this trip, or to sufficiently identify the place wherein defendant was imprisoned. During the day he was questioned, and then returned to Macomb and again locked in jail. John Bliven, deputy sheriff of McDonough County, stated that while in Springfield the plaintiff in error requested to see an attorney three or four times, but no effort was made to contact his attorney. It is thus undisputed that plaintiff in error was kept in custody for slightly more than three days, without an opportunity to furnish bail or consult an attorney, during which time he was in several different jails in Canton, Lewistown and Macomb, and taken

for one day to Springfield for questioning. On different occasions during these three days he requested to see an attorney to no avail. Such conduct on the part of the officers having custody of an accused person amounts to a denial of constitutional due process and is not to be tolerated in this State. People v. Frugoli, 334 Ill. 324, 166 N.E. 129; People v. Crabb, 372 Ill. 347, 24 N.E.2d 46."

■ We do not intend to create the impression that in holding the facts in the instant case amounts to a denial of due process, that we are embracing the Federal rule No. 5 for failure to immediately take the accused before the committing magistrate ipso facto voids the proceedings. This rule evolved from the case of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829, to be thereafter crystallized into rule No. 5 of the Court. Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192. Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100; Mallory v. United States, 354 U.S. 449, 451, 77 S.Ct. 1356, 1 L.Ed.2d 1479. We do not intend that our prior decisions holding to the contrary of rule No. 5 (Fry v. State, 78 Okl.Cr. 299, 147 P.2d 803) are to be overruled. For a learned discussion of some of the cases so holding see Hendrickson v. State, 93 Okl.Cr. 379, 229 P.2d 196, in an opinion by judge Powell, wherein, we expressly repudiated the Federal rule No. 5, and placed the admissibility of a confession in a trial upon the basis of voluntary, trustworthy, test of admissibility, which the state courts have consistently followed. As an example of our further disposition in this regard see Thacker v. State, Okl.Cr., 309 P.2d 306. We simply mean to hold that each such case must depend upon the facts therein involved for a determination of whether the accused has been denied due process sufficient to defeat jurisdiction and void the judgment. We do mean that delay in taking the accused before the magistrate may constitute an important element, when considered with other elements, in the denial of Constitutional and Statutory due process.

It has been repeatedly held that:

"When a person is held in custody under a void order of commitment, or is imprisoned without due process of law under the sentence of any court of the state, it is not only within the authority of this court, but it is its duty upon habeas corpus to inquire into the illegality of the commitment when the matter is properly brought before it by petition, and if it be adjudged that the order of commitment was made without authority of law, the person will be entitled to a discharge from custody in order to preserve the constitutional right of all persons not to be deprived of liberty without due process of law." Ex parte Meadows, 70 Okl.Cr. 304, 106 P.2d 139, 141.

See also Ex parte Sullivan, 10 Okl.Cr. 465, 138 P. 815. Also in Ex parte Barnett, 67 Okl.Cr. 300, 94 P.2d 18, 19, it was held:

"It must never be forgotten that the writ of habeas corpus is a precious safeguard of personal liberty, and that there is no higher duty than to maintain it unimpaired."

It has been aptly said "due process of law, as a historic and generative principle, precludes defining , and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.'" Rochin v. People of California, 342 U.S. 165, 72 S.Ct. 205, 210, 96 L.Ed. 183. The responsibility of the courts in such cases has been thusly stated; regard for the requirements of the due process clause inescapably "imposes upon this Court an exercise of judgment upon the whole course of the proceedings (resulting in a conviction) in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English–speaking peoples even toward those charged with the most heinous offenses. * * *" Malinski v. People of New York,

324 U.S. 401, 65 S.Ct. 781, 789, 89 L.Ed. 1029. Thus looking at the whole pattern of these proceedings; we see an ugly chain of events designed to effect one objective, namely the procurement of a confession by unlawful methods, through the denial of Constitutional and Statutory rights. Hence, the situation poses this question, what is the overall effect of this unlawful conduct on the part of the state's agents and the court? It is to render inadmissible all the evidence both physical and confessional falling within the ambit of denial of due process. When the trial court admitted the confession herein into evidence, it gave sanction to the Constitutional and Statutory infringements to obtain it as an instrument of conviction. Thus, the trial court by accepting with approval the fruits of this long chain of Constitutional and Statutory infringements became the consummate force in the denial of due process. When the trial court permitted itself under the pressure of a sense of devotion to law enforcement by the state, to become the pinnacle of this pyramid of indignities offensive to the "sense of justice", it lost jurisdiction and was without authority of law to pronounce a valid judgment and sentence, since the conviction was hinged upon the involuntary confession. Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948. As we said in Benton v. State, supra, if the state has not sufficient evidence, free from and unimpaired by the taint of denial of due process, upon which to predicate another prosecution, then the District Court of Stephens County is ordered to forthwith dismiss the prosecution and discharge the petitioner. The facts so flagrantly dispute the State's position on due process that we are compelled to grant the writ and release the prisoner for further proceedings consistent herewith. This defendant by virtue of the unusual turn of events fashioned by his own violation having taken no appeal on the merits of the case, has not gone unwhipped by justice, since he has already served approximately 12 years of a life sentence.

POWELL, P. J., and NIX, J., concur.