(No. 36652.—

The People of the State of Illinois, Defendant in Error, *vs.* Clarence Price, Plaintiff in Error.

*Opinion filed January 23, 1962.*

VICTOR P. MICHEL, of Peoria, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and JAMES C. CUNNINGHAM, State's Attorney, of Peoria, (FRED G. LEACH, Assistant Attorney General, of counsel,) for the People.

Mr. JUSTICE SOLFISBURG delivered the opinion of the court:

The defendant, Clarence Price, was found guilty by a jury of the crime of murder by arson, and sentenced to the Illinois State Penitentiary for the term of his natural life. Upon this writ of error defendant contends that his four

statements or confessions were elicited by coercion, and that their admission in evidence violated the constitutional guarantees of due process, as well as certain procedural rules; and that there was insufficient evidence to sustain the verdict.

The evidence developed during the pretrial hearing on the admissibility of the confessions and at the trial itself is conflicting. It is uncontroverted, however, that on November 23, 1959, at about 2 A.M., the Arion Hotel in Peoria, and a frame building adjacent to it, which were both owned by LaVerne Caldwell, were destroyed by a fire. Inasmuch as the buildings were engulfed in flames and the windows were out when the fire equipment arrived, it was the opinion of the fire officials that the fire had been caused by an explosion. The following day the charred and partially dismembered body of James Stevens, a 70-year-old resident of the hotel, was removed from the rubble. His death, in the opinion of the coroner's physician, was the result of extensive burns.

Defendant was employed by Caldwell to do the janitor work on these properties, to tend the boiler at Caldwell's residence, and to clean up the offices of his wife, known as Dr. Sanders. Defendant lived on other Caldwell property known as Caldwell Acres. He was a 33-year-old colored man who was born in Jackson, Mississippi. He knew nothing of his father, his mother died when he was five, and his grandmother reared him until her death when he was nine or ten. He quit school in the fifth grade and shifted for himself doing odd jobs. In February, 1944, when he was 16, he enlisted in the Navy, where he attended night school and qualified for 9th grade. Upon his discharge in November, 1947, he went to California, where he remained until May 1959. He then came to Peoria and started work for Caldwell. Defendant had no previous criminal record.

With reference to defendant's activities before and after

the fire, we shall note first his testimony at the trial, and then consider his various other accounts. According to defendant's testimony, at 4 P.M. on November 22, 1959, Caldwell said that he was leaving for Detroit and that defendant was to be in charge of the properties. Defendant was at the hotel intermittently through the evening. A guest testified that shortly before 1 A.M. defendant showed him a room in the absence of the desk clerk. Defendant claims that while lying down in one of the rooms he heard a door slam. A few minutes later he heard some glass breaking. He looked out and saw something brown against the building. Defendant armed himself with a stick and went down the stairs into the basement. As he neared the bottom of the basement steps there was a flash and explosion, and then fire came up all around, setting his hair and clothing afire. He claims he ran out the back door into the alley, saw a man running, and chased after him for help.

In this connection, two off-duty taxi drivers, testifying for defendant, stated that as they entered the alley from the rear door of a tavern in the early morning hours they saw a white man run out of the basement door of the hotel followed by a colored man who was yelling. A resident of the hotel, testifying for the People, said she heard glass breaking in the building next door, and that while she was on her way to tell the desk clerk there was an explosion.

Defendant testified further that he drove his car first to Dr. Sanders's office to get some salve, and then to Caldwell Acres where he dressed his burns and changed clothes. He was frightened that night, and again the following night by two men who drove up to Caldwell Acres. He hid in the woods and eventually hitchhiked to St. Louis. There he asked someone to buy a bus ticket for him, and spent the night in the DeLux Hotel under the name of Paul Jones. The next morning he rode by bus to Rhodessa, Louisiana, and stayed for a week at the residence of the "Reverend

Lee," later identified as L. L. Caldwell, to whom defendant had a letter of introduction given him by Caldwell in connection with a previous trip.

On defendant's return to St. Louis, he registered at the same hotel, but transferred during the night because of noise. The next morning he telephoned Caldwell, who told him to return to Peoria. Defendant was afraid to come alone, and on Caldwell's suggestion, defendant placed himself in the custody of the St. Louis police on December 5. On December 7 the Peoria police, at Caldwell's notification, came for defendant with a warrant charging him with arson. Officer Macklin asserts, but defendant denied, that the warrant was read to him. Defendant waived extradiction and rode back in a car, handcuffed, beside an officer holding a submachine gun. Defendant claims that when he told his story of the fire, the officers laughed and said that if he told that story he was heading for the electric chair and should get ready to meet his Maker.

They reached the Peoria jail at 1 P.M. on December 7th. It is undisputed that no return was made on the arson warrant, and that defendant was not taken before the magistrate, even though that office was close to the detention room where defendant was held in custody for some eleven days. The evidence respecting what transpired during that period is controverted.

Shortly after defendant's arrival at the Peoria police quarters, attorney Taylor from Chicago advised the police that defendant was his client. He was not permitted to see defendant on the ground that defendant was ill. Defendant claims that he was not told that Taylor was there. After two hours of questioning by police, defendant signed the first controverted confession.

While he admitted no guilt or knowledge of the fire in his statement, he did state that after the fire Caldwell came to Caldwell Acres and told defendant that he didn't want defendant questioned. Defendant was put in the trunk of

Caldwell's car and driven to St. Louis, where Caldwell bought him a bus ticket to Texarkana, Arkansas, and Rhodessa, Louisiana, and told him to stay with Lee Caldwell. Defendant remained there until Thursday, when a man brought him $20 and a note from Caldwell telling him to return to St. Louis and stay at the same hotel until Caldwell contacted him. While there defendant heard noises and feared for his life because of Caldwell's underworld contacts. That was why he changed hotels.

Although the police testified that defendant was given medical attention before that interrogation, the hospital records show that defendant was not admitted there until 6:10 P.M. He had two degrees of fever and was treated for first and second degree burns on his head, hands, feet, back and buttocks, and was given a tetanus shot. He was then returned to jail in the company of an officer carrying a submachine gun.

At 8:30 P.M. that first night reporters were permitted to see defendant. They testified that defendant said he wanted to remain in jail. Defendant denied this, and explained that the captain told him, "How long do you think you would live when you get on the street? We can't protect you on the street but we can protect you here." Defendant testified that he was also assured that it was Caldwell the police wanted, and that he didn't need a lawyer.

On December 8 defendant was taken to the office of State's Attorney Pratt. According to defendant's testimony, which is denied by Pratt, the latter offered to let defendant go "scot free" if he would state that Caldwell told him or anyone else to set the fire, and offered to see that defendant was safe in Carolina with a friend until Caldwell's trial. Defendant claims that Officer Macklin, who was also colored, told him about the kindnesses of the State's Attorney and that he was trying to help defendant.

Early on December 9, defendant was given a shirt and hat and taken by plane, and then by car, in the company of

the assistant State's Attorney and two police officers, to the place in Rhodessa, Louisiana, where defendant had previously stayed. After questioning the people in the vicinity, the group returned to Peoria by train and by car, due to the weather, and defendant spent two nights in local jails along the way.

On December 12 defendant was back in the Peoria jail. It is admitted that he was interrogated every day by several officers. He claims he was repeatedly told not to take the rap for someone else. On December 14 State's Attorney Pratt asked defendant to take a polygraph test, but defendant refused after he was told what it was. On the afternoon of December 15, defendant was taken by auto to Pekin and questioned in jail there. On his return to Peoria he was interrogated from 7 P.M. to 8:35 P.M., after which he signed the second controverted statement.

In that statement defendant still insisted that he did not set the fire, but revealed that Caldwell had told him to do so at 5 minutes to 2, after the property was to have been sold. He was then to go to the Farrington Road property (Caldwell Acres) and await Caldwell's return. Defendant also stated that he saw Caldwell at 9 P.M. and was told, "You haven't seen me since 5 o'clock." At 14 minutes to 2, after hearing a door slam, defendant went down stairs to the Club Room to check up. There was an explosion and fire was all around him. He never had a chance to light the fire. This statement included further details about Caldwell's assistance in bringing him to St. Louis and about his stay in Rhodessa.

Shortly before 11 P.M. that same night, defendant was taken to the captain's office and given a polygraph test by Jenkins, with Macklin present. Jenkins did not appear as a witness at the trial. Macklin testified that Jenkins told defendant that all his answers were true, except those concerning the lighting of the fire. After Macklin talked further to defendant, he hung his head and admitted he set the fire.

Another polygraph test was given immediately, after which the third controverted statement was taken. This time defendant confessed that he lit the fire at the direction of Caldwell.

The fourth statement or confession was taken on December 16, in the office of the State's Attorney. It was based substantially on defendant's third statement, with certain changes in wording, which defendant claims were made by the officers. At the trial defendant denied answering that he set the fire in his third and fourth statements, and denied that he had been asked any questions relating to his constitutional rights as recited in the statements.

At 11 P.M. on December 16, defendant was taken by auto to St. Louis in the company of two officers and the assistant State's Attorney to verify his account. They arrived at 3 A.M., and returned to the Peoria jail at 6 P.M. on December 17. The following day defendant was taken before a magistrate on a charge of murder. He had been told by the assistant State's Attorney, "Here is your lawyer," and was given a paper to sign authorizing Brunnenmeyer, a public defender, to represent him.

According to defendant, Brunnenmeyer told him to waive preliminary hearing, which he described as "Just a lot of people ask you questions and you'll get mixed up." Defendant claims, and Macklin denies, that Macklin told defendant that they would take care of him and to do as they said if he wanted to stay out of the electric chair.

Defendant was bound over to the grand jury on a charge of murder, and the arson charge was dismissed. He was then taken to the county jail.

According to the testimony of both defendant and the jailer at the Peoria County jail, defendant sent several notes asking to see attorney Robert Jones. The notes were destroyed on orders from the State's Attorney that no one was to talk to defendant. The State's Attorney, after denying such orders, explained that they were given at the re-

quest of Brunnenmeyer. Defendant, however, contacted Jones by way of a released prisoner. When State's Attorney Pratt learned that defendant was employing Jones, he visited defendant's friend, who had acted as intermediary, and told him to discharge Jones. The State's Attorney denied this, but explained that he had visited the friend to find out how defendant secured the services of attorney Jones.

On January 18, 1960, the grand jury indicted defendant for murder of James Stevens by arson. On a pretrial hearing, defendant's confessions were held admissible over his constitutional objections. At the trial he was found guilty by a jury verdict, which fixed his punishment at life imprisonment. His motion for new trial was denied and judgment was entered.

The primary inquiry on this writ of error is whether the admission of defendant's confessions violated the due-process guarantees of the Federal and State constitutions. The constitutional test for admission of a confession has been whether it was made "freely, voluntarily and without compulsion or inducement of any sort," or whether the defendant's will was overborne at the time he confessed. (*Culombe* v. *Connecticut*, 367 U.S. 568, 6 L. ed. 2d 1037; *Reck* v. *Pate*, 367 U.S. 433, 440, 6 L. ed. 2d 948; *United States* v. *Carignan*, 342 U.S. 36, 41, 96 L. ed. 2d 48; *Turner* v. *Pennsylvania*, 338 U.S. 62, 93 L. ed. 1810.) Compulsion includes torture of mind as well as of body, for the will is as much affected by fear as by force. *Watts* v. *Indiana*, 338 U.S. 49, 52, 93 L. ed. 1801.

As explained in the *Watts* case at p. 53 : "When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary."

Exhaustive review of the cases adjudicating the constitutionality of confessions is not feasible. Nevertheless, it is essential to refer to analogous cases, not for a "mere color matching" (*Reck* v. *Pate,* 367 U.S. 433, 442), but to discern realistic standards. *Culombe* v. *Connecticut,* 367 U.S. 568.

In *Culombe* v. *Connecticut,* a recent decision of the United States Supreme Court, the accused was detained in police custody for four nights and five days on a misdemeanor charge. He was questioned intermittently by one or more officers; he had neither counsel nor warning of his constitutional rights; and he was not brought before the magistrate until after his confession of murder at midnight of the fifth day. The court, in concluding that the confession violated due process, stressed the duration of the detention, distinguishing it from cases where confessions were elicited after merely hours of questioning on the day of arrest. The court also emphasized the failure to bring the accused before a magistrate or advise him of his constitutional rights, and the emotional effect of the visits by his family.

In *Turner* v. *Pennsylvania,* 338 U.S. 62, where the petitioner was held for five days without arraignment or counsel or contact with friends, while being intermittently interrogated by relays of police officers for as much as six hours a day, his confession was deemed coerced and in violation of due process.

In *Watts* v. *Indiana,* 338 U.S. 49, the accused was kept in solitary confinement for the first two days, interrogated intermittently during the next five days, driven around to elicit disclosures, and not brought before the magistrate until after his confession. In concluding that the confession violated due process, the United States Supreme Court stated at p. 53: "To turn the detention of an accused into a process of wrenching from him evidence which could not

be extracted in open court with all its safeguards is so grave an abuse of the power of arrest as to offend the procedural standards of due process."

In *People* v. *Crabb*, 372 Ill. 347, this court held a confession to be involuntary and in violation of due process where the 21-year-old accused was grilled intermittently for two days by five different persons and there was a failure to return the warrant to the issuing magistrate, or to permit the prisoner to confer with counsel or parents.

In *People* v. *Goldblatt*, 383 Ill. 176, where the accused was subjected to extensive interrogation day and night for nearly three days before being brought before the magistrate and was not permitted to see relatives or have counsel, the court held that his confession violated due process.

In *People* v. *Vinci*, 295 Ill. 419, a confession was deemed involuntary where the accused was questioned for three days, no warrant was issued for his arrest, and he was not brought before a magistrate. The court deemed decisive the fact that he "became convinced that he was bound to make a statement to secure relief from the continuous questioning by those having him in custody  *  *  *."

However, this court has held that mere illegal detention in the absence of other coercive circumstances does not constitute a denial of due process, particularly where the accused is neither illiterate nor uninformed as to police practices, and has had previous criminal experience. *People* v. *Hall*, 413 Ill. 615; *People* v. *Miller*, 13 Ill.2d 84.

From the foregoing review it is apparent that this court, adhering to the same approach as the United States Supreme Court, has regarded the issue of whether a confession violates due process as a question of fact to be determined in each case from all the attendant circumstances. (*People* v. *Vinci*, 295 Ill. 419; *People* v. *Crabb*, 372 Ill. 347; *People* v. *Goldblatt*, 383 Ill. 176; *People* v. *Hall*, 413 Ill. 615, 623; *People* v. *Miller*, 13 Ill.2d 84, 100; *Watts* v. *Indiana*, 338 U.S. 49, 53; *Culombe* v. *Connecticut*, 367 U.S. 568; *Reck*

v. *Pate,* 367 U.S. 433; *Turner* v. *Pennsylvania,* 338 U.S. 62.) Determinative factors include not only illegal detention but its duration, the relentlessness of interrogation, disregard of the rudimentary necessities of life, the deprivation of counsel, deception respecting the accused's constitutional rights, the accused's age, education, emotional characteristics, and experience in criminal matters.

In the instant case, the mental compulsion used to elicit defendant's confessions was more aggravated than in any of the cases noted. Nowhere was the detention as lengthy. In the *Turner* and *Culombe* cases the detention was for five days; in the *Watts* case it was for a total of seven days; whereas in the case at bar defendant was held in custody *incommunicado* for eight days before he confessed, and eleven days before he was brought before the magistrate. While the intensity of interrogation was not as great as in the *Turner* case, nevertheless, it is undisputed that there was interrogation every day defendant was held in custody, at all hours of the day and night, including a lie detector test at 11 P.M. on the eighth day of detention. That course was hardly routine questioning normally expected to follow an arrest on suspicion of murder.

Moreover, defendant was not merely shuttled between police stations, as condemned in the *Watts* case, but was taken by the authorities to Louisiana during his detention to check his story. Nor can the coercive effect of his being accompanied by an officer carrying a submachine gun be minimized, particularly in view of his voluntary surrender to the authorities.

While there was not the complete disregard of the rudimentary necessities of life, as in *Watts* v. *Indiana,* 338 U.S. 49, and *Reck* v. *Pate,* 367 U.S. 433, nevertheless, defendant was questioned for over two hours prior to being given medical treatment, despite the fact that the hospital records showed he was suffering from second degree burns and had fever.

In addition, there was not merely a failure to inform defendant of his right to counsel, and to be taken before a magistrate, but substantial evidence that he was deliberately denied counsel. Attorney Taylor was not permitted to see defendant when he was first taken into custody and on the next day, on the ground that defendant was ill. Yet that illness did not preclude his interrogation. The claim that defendant did not want counsel must be considered in the light of the deception practiced upon him. His fears were inflamed that he would be killed if released from jail, and he was reassured that he was only being held as a witness, since Caldwell was the one they wanted. The potency of this ruse on a frightened, poorly educated man, inexperienced in police methods, certainly affects the voluntary character of his action. Moreover, the lengths to which the State's Attorney's office subsequently went to prevent defendant from securing counsel, other than the selected public defender, is hardly consistent with an ever-present willingness to allow him counsel during his long detention.

The conclusion is therefore inescapable that this total combination of circumstances was so inherently coercive as to overbear the will of the defendant and was inimical to any voluntary confession. Consequently, the incriminating statements of December 15 and 16 violated the constitutional due process guarantees and were inadmissible in evidence, notwithstanding their veracity or the fact that they could possibly be independently established as true. (*Lisenba* v. *California,* 314 U.S. 219, 236, 86 L. ed. 166.) In barring these confessions we are merely applying the due process clause to "its historic function of assuring appropriate procedure before liberty is curtailed" (*Watts* v. *Indiana,* 338 U.S. 49, 55); we are in no way impairing the requisite leeway for reasonable and practical police investigation.

Inasmuch as the controverted evidence offended constitutional doctrines, its admission constituted reversible error. It is therefore not necessary to determine whether the evi-

dence also violated procedural rules. In the absence of these statements, furthermore, the evidence in the cause does not sustain the verdict of the jury. Hence, judgment entered thereon is reversed.

*Judgment reversed.*