John Walter CASTRO, Sr., Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–85–205.

Court of Criminal Appeals of Oklahoma.

Dec. 3, 1992.

Rehearing Denied Jan. 8, 1993.

160

Royce A. Hobbs, Kurtis M. Kasper, Perry, Trial Counsels for appellant.

Joseph A. Wideman, Dist. Atty., Dan Allen, Asst. Dist. Atty., Newkirk, Trial Counsels for appellee.

Thomas Purcell, Asst. Appellate Public Defender, Oklahoma City, for appellant.

Michael C. Turpen, Atty. Gen., Jean M. LeBlanc, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

BRETT, Judge:

Appellant, John Walter Castro, Sr., on September 26, 1983, was charged in the District Court of Noble County, Case No. CRF–83–70, with Count I: Robbery with a Firearm, Count II: Larceny of an Automobile, and Count III: Murder in the First

Degree. A Bill of Particulars was filed against appellant in this case on November 8, 1983, alleging two aggravating circumstances: (1) that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (2) that there exists the probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. On September 6, 1984, the information was amended to Count I: Murder in the First Degree, in violation of 21 O.S. 1981, § 701.7, and Count II: Larceny of an Automobile, in violation of 21 O.S.1981, § 1720.

Jury trial was held February 4 through March 11, 1985. The jury found appellant guilty on both counts. After finding the existence of the second aggravating circumstance, that there exists the probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society, the jury sentenced him to death for Count I. The jury assessed twenty (20) years imprisonment for Count II. From this judgment and sentence, appellant has perfected his appeal to this Court. We affirm.

On April 17, 1983, appellant was hitchhiking from Ponca City, Oklahoma, where he lived with his girlfriend, Patti DeNoya, to Oklahoma City. Appellant and Ms. DeNoya had been arguing. He ended up in Stillwater where he was picked up by a police officer at 1:30 or 2:00 in the morning. The officer found him a motel room for the night. Appellant phoned Ms. DeNoya collect to let her know where he was and that he would be home the next day. On April 18, 1983, appellant hitch-hiked to a gas station called Bill's Corner to see about catching a bus to Oklahoma City. He was told that the next bus would not be for many hours, so appellant decided to hitchhike to Oklahoma City. While appellant was outside of the store eating a snack, Beulah Grace Cox pulled into the parking lot. Appellant knew Ms. Cox through Ms. DeNoya, so he approached her. Ms. Cox told appellant that she was headed to Stillwater; she was a student at Oklahoma State University. She asked him where he was headed, to which he replied, the campus. She gave him a ride.

On the way, Ms. Cox told appellant about her studies at Oklahoma State University. She told appellant that she was learning how to mess with peoples minds. This made appellant angry at her. According to appellant, the two shared a couple of marijuana cigarettes along the way. She pulled off the main road at one point to a wooded area because appellant had to urinate. At some point, appellant pulled a gun on her because he decided to steal her car. She got out of the car, as did appellant. She asked him if he was going to kill her, to which he said no. She asked him if he was going to rape her, to which he said no. These questions made him even more angry. He decided to take her car and leave her in the wooded area. Instead, he went back to where she was squatted on the ground and shot her in the head. Then he shot her two or three more times to make sure that she was dead. As a result, Ms. Cox died of gunshot wounds to the head.

Appellant drove the decedent's car to Oklahoma City. The next day, he washed the car in order to remove any of his fingerprints. Then he parked the car in front of the bus station with the windows down in hopes that someone would steal the car or at least the contents. He phoned Ms. DeNoya collect from the bus station and he told her that he did something bad—that he had killed someone.

On June 6, 1983, appellant was arrested in his home in Ponca City on an unrelated charge. During a search of the home, to which appellant consented, officers found a gun that was later determined to be the murder weapon. Appellant admitted to the officers that he was the owner of the gun.

While in the Kay County jail awaiting trial on the unrelated charge, appellant told Steven Wayne Gregory, a fellow inmate, that he had killed someone in Stillwater. The first part of August 1983, appellant made a map showing the location of the decedent's body and showed this map to Gregory. On August 10, 1983, in hopes of receiving favorable treatment from the District Attorney's office, Gregory told an in-

vestigator from that office, Raymond Ham, about the map. Ham and Gregory, along with other law enforcement personnel, went to Noble County to see if they could locate the body. Gregory was able to lead the officers to the area mapped out by appellant, where they found the skeletal remains of a body, which was later determined to be those of Beulah Grace Cox. Later that same day, Gregory was transferred to the Noble County jail for his own protection. A shakedown of the cells at the Kay County jail revealed the map that Gregory had told the investigator about in appellant's cell. When the jailers removed the map from appellant's cell, appellant admitted that the map was his, but that they did not have the right to remove that from his cell.

Appellant admitted several times to different people that he killed Beulah Grace Cox. Although each statement was a little different, the basic facts of how appellant killed the decedent remained constant. On September 30, 1983, while in the Kay County jail, appellant told the jailers that he wanted to talk. Raymond Ham, the investigator from the District Attorney's office, went to see appellant. Appellant told Ham that he wanted to talk and that he wanted his attorney present. After his attorney arrived, appellant was advised of his *Miranda* [1] rights by both his attorney and Ham. Appellant confessed to killing Ms. Cox, as well as other crimes. On February 21, 1984, after being advised of his rights, appellant confessed to Charles Blair of the Kay County Sheriffs Department of killing Ms. Cox. That conversation was recorded. At the trial in Kay County on the unrelated charge, on April 16, 1984, appellant testified that he killed Ms. Cox.[2] Later, appellant was transferred to Noble County to await trial on these charges. Then on June 29, 1984, appellant was creating a commotion in his cell in the Noble County jail. When the deputy sheriff went to see what the problem was, appellant told the deputy that he had killed Ms. Cox. At trial, appel-

lant objected to each of these statements being admitted into evidence.

At trial, appellant's defense was not guilty by reason of insanity. He testified during the second stage that he did in fact kill Beulah Grace Cox, but that he did not know why or whether he would kill someone again if he only received life imprisonment.

Because appellant's first and ninth assignments are related, we will address them together. Appellant contends in his first assignment that he was deprived of a fair trial due to a conflict of interest because his attorney in the Kay County case represented both appellant and Gregory. In his ninth assignment he argues that his confession to Investigator Ham on September 30, 1983, was inadmissible because he had not yet been brought before a magistrate on these charges and because of the supposed conflict of interest. He requests an evidentiary hearing in order to "reveal [the] extent of the prejudice caused by this conflict." (Appellant's Brief 16).

Appellant argues that he was prejudiced by this "conflict" in that his attorney in Kay County, Ken Holmes, was present when appellant confessed on September 30, 1983, to Ham in the Kay County jail and that previously Mr. Holmes had represented Gregory on his pending charges. The record reflects that at the time of the September 1983 confession, Mr. Holmes was not representing Gregory; Tom Rigdon had been court-appointed to represent Gregory in May 1983. Since Mr. Holmes was not appellant's attorney at trial on the charges at issue in this appeal, the only effect this possible "conflict" could have, would been on the admissibility of the September 30, 1983, confession. We find no conflict; however, even if such a conflict did in fact exist, that would not necessarily mean that appellant's statement was involuntarily given.

A confession is deemed voluntary if "it is the product of an essentially free

**1.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** This statement was admitted at trial, but the jury was not told that it was from a previous murder trial.

and unconstrained choice by its maker." *Young v. State,* 670 P.2d 591, 594 (Okl.Cr. 1983). Voluntariness is determined by a consideration of the totality of the circumstances. *Palmer v. State,* 788 P.2d 404, 407 (Okl.Cr.1990). On that date, appellant stated that he wanted to talk to someone from the district attorney's office. Investigator Ham went to the jail to see what appellant wanted. Almost immediately, appellant stated he wanted his attorney present. Ham ceased any further conversation with appellant until his attorney arrived. After both his attorney and Ham advised appellant of his *Miranda* rights, appellant confessed to Ham about the Kay County murder and the murder of Beulah Cox. After the jury was selected, but before testimony began, the trial court conducted an in camera hearing to determine the voluntariness of his many confessions, in accordance with *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The trial court found that appellant did, of his own free will, give this statement to Ham. Also, the jury was properly instructed on the use of the confessions.

■ Appellant cites *Benton v. State,* 86 Okl.Cr. 137, 190 P.2d 168 (Okl.Cr.1948), and *Application of Fowler,* 356 P.2d 770 (Okl. Cr.1960), to support his contention that the delay in bringing him before a magistrate on these charges is reversible error. However, *Benton* and *Fowler* are distinguishable from the case at bar. In both cases, the defendants had been horribly treated by the authorities before they confessed. The fact that they had not been taken before a magistrate and formally charged with a crime was one of many factors in the Court's determination that their confessions were coerced and involuntary. As stated in *Fowler:*

> By means of the denial of the right to counsel at all stages of the proceedings, including the period of investigation, the failure to charge [the defendant] with murder and take him before the nearest magistrate as provided by law, his removal to avoid habeas corpus proceedings, constitutes coercive custody. That conduct, together with threats against his life, and of torture, effected mental

duress, broke his resistance, and wrung from him an involuntary confession.

356 P.2d at 774.

> We simply mean to hold that each case must depend upon the facts therein involved for a determination of whether the accused has been denied due process sufficient to defeat jurisdiction and void the judgment. We do mean that delay in taking the accused before the magistrate may constitute an important element, when considered with other elements, in the denial of Constitutional and Statutory due process.

*Id.,* at 778 (Emphasis added). In addition, the delay of the initial appearance on the present charges was at the request of appellant's Kay County attorney. There was both a basis for the delay and no showing of prejudice caused by it. After considering all of the facts and circumstances surrounding this statement, we find that appellant's confession given on September 30, 1983, was voluntarily given and that there is no conflict that requires a reversal of appellant's convictions.

■ In his second assignment, appellant contends that the trial court erred in excluding two potential jurors for cause. Appellant argues that prospective jurors Stephens and Lumbers were improperly excused for cause because of their reluctance in imposing the death penalty. A potential juror cannot be excluded for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1776, 20 L.Ed.2d 776, 785 (1968). However, as we held in *Davis v. State,* 665 P.2d 1186 (Okl.Cr.1983), *cert. denied,* 464 U.S. 865, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983), we must look at the entirety of the juror's voir dire examination to determine if the trial court properly excused the jurors for cause. In *Davis,* three jurors who were ambiguous, hesitant and equivocal in responding to questions concerning the death penalty, were found to be properly excluded for cause.

When the voir dire examination is viewed in its entirety as to each juror, and in the light most favorable to the defendant, the trial judge could only conclude that the mind of each juror was that said juror was irrevocably committed, before the trial began, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. Their answers were ambiguous, hesitant and equivocal. The trial judge was in a position to view the facial expressions, voice inflection, and mannerism in answering the questions on voir dire. He evaluated the responses from the totality of the courtroom environment and experience on that day. The record supports his evaluation.

665 P.2d at 1194. *See also Banks v. State,* 701 P.2d 418 (Okl.Cr.1985), *cert. denied,* — U.S. —, 112 S.Ct. 883, 116 L.Ed.2d 787 (1992).

Juror Stephens was voir dired in part as follows:

(BY THE STATE) Q: ... In a case where the law and the evidence warranted it, in a proper case, could you, m'am [sic], without doing violence to your conscience, agree to a verdict imposing the death penalty?

(BY JUROR STEPHENS) A. I cannot.

Q. All right. Then I need to ask you another question: If you found beyond a reasonable doubt that the defendant was guilty of Murder in the First Degree, and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death, are your personal reservations about the death penalty such that regardless of the law, the facts and the circumstances of a case that you, as a person, would not inflict the death penalty?

A: No. I can't; I won't. I am sorry.

Q: You won't?

A. No.

(Tr. 1744–45). Then, after being questioned by defense counsel, Juror Stephens gave the following answers.

(BY THE STATE) Q: Mrs. Stephens, considering the fact that both sides of this case are entitled to a fair consideration on every issue, I need to ask you: Are your personal views about the death sentence such that they would prevent or substantially impair the performance of your duties as a juror in accordance with the instructions and your oath?

(BY JUROR STEPHENS) A: I am afraid it would impair; yes, it would.

(Tr. 1751). Then the following transpired with Juror Lumbers.

(BY THE STATE) Q: ... In a case where the law and the evidence warrant, in a proper case, could you without doing violence to your conscience, agree to a verdict imposing a death penalty?

(BY JUROR LUMBERS) A: I believe in the death penalty but I had never had it put upon myself to give that kind of judgment; I don't know whether I could do that.

Q: Thank you, Mrs. Lumbers. Let me ask you: If you found beyond a reasonable doubt that the defendant was guilty of Murder in the First Degree, and if under the evidence, facts and circumstances of the case, the law would permit you to consider a sentence of death, are your reservations about the death penalty such, that regardless of the law, the facts and the circumstances of the case that you would not inflict the death penalty?

A: I don't know what to tell you; I have never been in that situation before. I don't know what to do.

(Tr. 2551).

A. I don't have any problem with the fact that there is a death penalty. It's just that I don't know if I was put in a situation where I had to say, you know, you would have to take this person's life away; if that's what the law says that they can, you know, that that can be handed down to them, I just don't know whether I, myself, say that yeah, I want that person put to death.

Q. Are you saying that regardless of what the facts and circumstance of the case would be?

A. Yeah. I don't know what to tell you how I would react. I really don't know. (Tr. 2553).

Q. ... Can you foresee of a case where you could make a finding of guilty on a First Degree Murder case which you feel that the death penalty would be appropriate?

A: I would have to be totally, absolutely, just beyond a shadow of most definite doubt, you know, that it did happen. Like I say, if it was put right before me in my face, I don't know whether I could bring myself to put it upon me to take someone's life. I have never had that presented to me before, so I don't know. But I do believe in that penalty, but honestly, I don't know whether I could do that.

(Tr. 2554-55).

(BY THE DEFENSE) Q: ... Can you make that same fair and impartial decision as to the punishment that you would give in this case?

A: Let me try to say it this way. If I believed a man was guilty, and I was presented with the life or the death sentence, and I could not bring myself to give this man a death sentence, I could give him life, but I don't know whether I can—I could make myself say that this man is for the death penalty. I don't know.

(Tr. 2557-58). As in *Davis*, Jurors Stephens and Lumbers, while they were equivocal and non-committal, both expressed that they would be unable to impose a sentence of death against appellant. The trial court had the opportunity to evaluate their demeanor during voir dire and the record supports the evaluation that they could not be fair and impartial jurors during the second stage. This assignment must fail.

■ In his third assignment, appellant contends that the trial court erred by failing to give his requested instruction on first degree manslaughter. A trial court need only give instructions on lesser included offenses when there is evidence that tends to prove the lesser crime. *Walker v. State*, 723 P.2d 273, 283 (Okl.Cr.1986), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986). In this case, there was no evidence tending to prove first degree manslaughter, which is defined as a homicide "perpetrated without design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon...." 21 O.S.1981, § 711(2). Therefore, the trial court did not err in failing to give such an instruction. This assignment must fail.

■ In his fourth assignment, appellant contends that the trial court erred by removing a potential juror. One venireman, whom defense counsel had previously represented, admitted to the trial court, through questioning from the assistant district attorney, that he was an alcoholic. The trial court removed him from jury service, to which defense counsel objected. Appellant now claims that his convictions should be reversed, to which he cites the Sixth and Fourteenth amendments to the United States Constitution. However, he has failed to demonstrate how he was prejudiced by the removal of this man and in fact the record indicates that defense counsel considered the venireman to be unqualified to serve as a juror.[3] Appellant is correct that the statute, 38 O.S.1981, § 28, no longer automatically disallows "drunkards" from jury service; however, the record indicates that the venireman was removed, not because he was an alcoholic, but rather because of Mr. Hobbs representations to the trial court and the State, through his prior association with the venireman, that he was unfit to serve on the jury. This assignment is denied.

■ Appellant contends in his fifth and seventh assignments that the search of his

3. BY MR. WIDEMAN (FOR THE STATE): ... For the record's sake, I would advise the court on the record that Mr. Hobbs, as an officer of the court, informed the court yesterday and myself that he, personally, considered Mr. _____ [a former client] as a habitual alcoholic, unqualified to serve under the statute, and felt like the court and myself should know this information, and that the record should so reflect, and should be tempered to the objection that he just lodged, again, as an officer of the court. (Tr. 141-42).

home and his arrest on June 6, 1983, were illegal and therefore any statements he made or evidence obtained as a result of that search and arrest were inadmissible. During the *Jackson v. Denno* hearing, details of appellant's arrest were revealed to the trial court. On June 6, 1983, at around 10:15 p.m., O.S.B.I. agent David Page and other law enforcement personnel went to the home of appellant and his girlfriend, Patti DeNoya, to look for appellant. He was a suspect in a robbery/murder that occurred that afternoon in Ponca City. When the officers knocked on the door, Ms. DeNoya answered the door. After explaining to her who they were, Ms. DeNoya requested time to change her clothes. A few minutes later, she returned to the door. Agent Page asked her if appellant was there; she said that he was not. Agent Page asked if they could search the house to make sure, to which she agreed. Appellant was found standing up against a wall in a darkened bedroom that was occupied by Ms. DeNoya's small child.

After checking to make sure that there were no other people in the house, Agent Page asked appellant if the officers could search the residence. Appellant agreed and executed a Consent to Search Form. While Agent Page searched the house, a Ponca City police officer stayed with appellant and Ms. DeNoya in the living room. During the search, Agent Page found a semi-automatic pistol that had been secreted in an attic opening. Ballistics tests later determined that the pistol was used to shoot the decedent in this case. Appellant admitted to Agent Page that the pistol belonged to him. Other items were found that linked appellant to the robbery/murder in Ponca City.

Agent Page requested that appellant accompany him to the Ponca City Police Department for questioning, to which appellant agreed. Before the questioning began, appellant was advised of his *Miranda* rights and he signed a rights form. During the interview, appellant admitted that he stabbed the woman in the Ponca City store, although at first he stated that when he first arrived at the store she had already been killed. This statement was not admitted at trial.

We find that the search of appellant's home was legal and that statements made by appellant during the search were legally obtained. Agent Page gained lawful entry into the house by Ms. DeNoya. Appellant signed a Consent to Search Form which clearly stated his right to refuse the search. (State Exhibit 1–B). Appellant contends that he was coerced into consenting to the search because he was told to sit on the couch in the living room with an officer present while Agent Page searched the house and that Agent Page conducted a custodial interrogation when he found the pistol. We do not find that appellant was coerced into signing the Consent to Search Form or that he was "interrogated" by Agent Page. Moreover, we find that there is competent evidence that reasonably supports the judge's finding that the search was lawful and that the statements made by appellant after that search and subsequent arrest were legal. *See Sullivan v. State*, 716 P.2d 684, 687 (Okl.Cr.1986). Therefore, this assignment must fail.

Next we will address appellant's sixth and twelfth assignments of error together since the issues raised in these two assignments are related. In his sixth assignment, appellant contends that the prosecution failed to reveal exculpatory evidence, as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and therefore his convictions should be reversed. Specifically, appellant contends that the State failed to disclose that Gregory had been given a lenient sentence on his charges because of the information he provided to the police about appellant. He also contends in his twelfth assignment, that all of the information which was provided to the State by Gregory should have been suppressed because Gregory was a government agent. First, we will address the issue of whether Gregory was a government agent, for if he was, all of his testimony and any evidence obtained as a result of his information to the State would have to be suppressed. *See United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65

L.Ed.2d 115 (1980). Second, we will address appellant's contention that the State failed to disclose exculpatory evidence as to Gregory.

Appellant filed a Motion to Suppress any statements made by Gregory because he was a police informer. Appellant argued—both at trial and now on appeal—that because Gregory received a ten (10) year suspended sentence with only the first two years supervised, after having prior felony convictions, that he was an agent for the government, and therefore, his testimony and any evidence derived therefrom should have been suppressed. At a pre-trial hearing on the motion, the trial court found that Gregory was not an agent for the State. Although Gregory was looking for favorable treatment from the district attorney's office when he provided the information on appellant, there was no evidence presented of any expressed or implied relationship between Gregory and the State as relates to appellant.[4] *See United States v. Taylor*, 800 F.2d 1012, 1016 (10th Cir.1986), *cert. denied*, 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987). *Cf. United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Therefore, we hold that Gregory was not acting as an agent for the State, and therefore the trial court did not err in failing to suppress his testimony.

 *Brady v. Maryland*, requires the State to reveal to the defense, before trial, all exculpatory evidence that is material to the defense. The State must disclose such information even if it has not been requested. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). A defendant must show that the evidence was material; that is, that it can be demonstrated that there is a reasonable probability that the verdict would have been different had the information been disclosed. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). And a mere possibility of a differ-

ent verdict is insufficient. *Behrens v. State*, 699 P.2d 156, 157 (Okl.Cr.1985).

Contrary to what appellant contends in his brief, defense counsel was able to effectively cross-examine Gregory as to the lenient sentence that he received for providing the information against appellant. Also, the trial court gave appellant's requested jury instruction on the weight to be given the testimony of an informer. (O.R. 89). It does not appear that appellant's defense was prejudiced in any way by the State failing to disclose, prior to the motion to suppress hearing, the sentence Gregory ultimately received. Therefore, we find no error warranting reversal of appellant's convictions on these grounds.

 In his eighth assignment, appellant argues that the trial court erred by allowing the prosecutor to cross-examine Dr. Steven Caldwell, a psychologist testifying for the defense, as to appellant's probability of being rehabilitated, to which he objected. The extent of cross-examination of any witness rests in the sound discretion of the trial court. This Court will only reverse a conviction on this issue if that discretion was clearly abused and resulted in manifest prejudice to the defendant. *Hall v. State*, 698 P.2d 33, 36 (Okl.Cr.1985). The State, as well as the defense, may cross-examine any witness as to any matter and issue which affects that witness' credibility. *Dennis v. State*, 561 P.2d 88, 93 (Okl.Cr.1977).

Dr. Caldwell testified in support of appellant's insanity defense from a report that he had prepared after interviewing appellant and conducting tests on him. In his report to defense counsel, Dr. Caldwell stated that the chances of appellant benefiting from rehabilitation, even with psychotherapy treatment, was low. The State questioned Dr. Caldwell from his report about his findings concerning appellant's mental capacity. We do not find an abuse of discretion by the trial court in allowing

---

**4.** There was testimony at the motion to suppress hearing that Gregory had initially entered into a plea agreement with the authorities that he would provide them with information as to narcotics transactions in the area. However, this agreement fell apart because Gregory did not provide the appropriate information. At the time in question, Gregory did not have a plea agreement with the State.

the State to cross-examine Dr. Caldwell as to the probability of rehabilitation for appellant. Therefore, this assignment fails.

In his tenth and eleventh assignments, appellant contends that two separate confessions were inadmissible as well. Once again, this Court will review the facts and circumstances surrounding a confession to determine if it was the product of an essentially free and unconstrained choice by its maker. *See Young; Palmer.* On February 21, 1984, during a presentence investigation in Kay County on appellant's other murder charge, he confessed to the officer conducting the investigation that he killed Beulah Cox. Appellant was read his *Miranda* rights before the interview began. On June 29, 1984, while incarcerated in the Noble County jail, at about 11:00 p.m., appellant began to create a disturbance. When the jailer went to investigate, appellant was emotionally upset. Without any *Miranda* warnings being given, appellant admitted to the jailer that he killed Beulah Cox. After considering the circumstances surrounding these two confessions, we find that both were the product of appellant's free and unconstrained choice. Once again, simply because appellant had not been brought before a magistrate on these charges does not automatically make the confessions involuntary. Reversal is not required.

In his thirteenth assignment, appellant argues that the trial court erred by admitting various state exhibits. The exhibits appellant contends were inadmissible were photographs of the foliage in the area where the body was found, photographs of the skull, and personal effects of the decedent. The general rule is that admissibility of demonstrative evidence, such as photographs and the personal effects, is a question of legal relevance within the sound discretion of the trial court. *Hiler v. State,* 796 P.2d 346, 351 (Okl.Cr. 1990). When the probative value is not outweighed by the danger of prejudice to the defendant, the evidence is admissible. 12 O.S.1981, § 2403. This Court has also repeatedly held that the question of whether the probative value of a photograph

outweighs any possible prejudice is a matter falling within the sound discretion of the trial court. Absent a clear abuse of that discretion, this Court will not disturb the lower court's ruling. *Rawlings v. State,* 740 P.2d 153, 161 (Okl.Cr.1987).

Photographs are admissible as appropriate aids to the jury, when they are shown to be faithful reproductions of whatever they purport to reproduce. *Billy v. State,* 602 P.2d 237, 240 (Okl.Cr.1979). The photographs of the area where the body was found were taken in August 1983. Appellant contends that the photographs were more prejudicial than probative because the foliage in August was heavier than what would have been present in April when the crime occurred. We disagree. The photographs were a fair reproduction of the area and were an aid for the jury to visualize the area in which the decedent's remains were found. Any prejudice to appellant that resulted from these photographs was outweighed by its probative value. Also, appellant was able to bring to the jury's attention the fact that these photographs did not necessarily depict the area as it appeared in April. Any doubt as to whether the conditions depicted in the photograph were the same as when the crime occurred should go to its weight and not its admissibility, as long as it is a fair reproduction of what it is claimed to represent.

Appellant also argues that the introduction of photographs of the decedent's skull and some personal effects from her car were inadmissible. He contends that since there was no question that Mr. Castro had killed the decedent, nor that a bullet wound to the back of the head had been the cause of death, the photographs had no probative value and were more prejudicial. We disagree. While it is true that who died or how she died was not an issue in this case, appellant's counsel refused to stipulate as to the identity of the decedent. In every criminal prosecution, the State must prove, first, the *corpus delicti,* and second, that the crime was committed by the accused. "Pictures of the murder victim are always probative in establishing the *corpus delicti* of the crime." *William-*

son v. State, 812 P.2d 384, 400 (Okl.Cr. 1991), cert. denied, —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). Therefore, we find that the pictures of the skull—even the one showing the top and front of the skull without any injury—and the personal effects of the decedent were relevant to show the identity of the decedent and corroborated appellant's confession. The probative value outweighed any prejudicial effect, therefore, reversal is not required.

■ In his fourteenth assignment, appellant contends that reversible error occurred when the jury was allowed to view a brown paper sack that contained a femur bone of the decedent. He claims that the State intentionally brought the bone into the courtroom to inflame the passions and prejudices of the jury. We disagree. A thorough reading of the transcript on this issue reveals that the bone was never removed from the paper sack, and the prosecutors did not bring the bone into the courtroom, but rather the medical examiner did. At the next recess in the trial, the prosecutors removed the wrapped bone along with other items of evidence. The wrapped bone was never used by the prosecutor in any way during the trial or in his closing arguments.

Even if this was error, appellant has failed to demonstrate any prejudice by the presence of this wrapped bone on the prosecutor's table. See Newsted v. State, 720 P.2d 734, 739 (Okl.Cr.1986) cert. denied 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). Displaying a human leg bone such as this during a murder trial could be prejudicial, under different circumstances. In this case, the mere presence of this wrapped bone for a short time during the trial is not enough to warrant reversal of appellant's convictions.

■ In his fifteenth assignment, appellant contends that the trial court erred by allowing the State to introduce during the second stage of trial a papier-maché gun

that appellant had made while in jail and a small lighter. He demonstrated to a jailer how the lighter could be used as a weapon. Appellant argues that both of these items were irrelevant and highly prejudicial. We disagree and find that both items were relevant to establish the aggravating circumstance that appellant would pose a continuing threat to society.

■ Title 21 O.S.1981, § 701.10(C) states: "In the sentencing proceeding, evidence may be presented as to any mitigating circumstances or as to any of the aggravating circumstances enumerated in Section 701.7 et seq. of this title. Only such evidence in aggravation as the state has made known to the defendant prior to his trial shall be admissible." The State did provide the requisite notice to appellant of the evidence, including the use of the papier-maché gun and the lighter, it would present during the second stage of the trial. Appellant's assertions that the papier-maché gun was merely an art project that the jailers were well aware of does not make the item irrelevant and therefore inadmissible. Even if this evidence were inadmissible, there was sufficient evidence presented to support the jury's finding of the aggravating circumstance that appellant would pose a continuing threat to society.[5] Therefore, modification or vacation of appellant's death sentence is not warranted.

■ Appellant argues in his sixteenth assignment that the trial court erred in giving Instruction 5,[6] which sets out for the jury what they can consider when determining whether to find the continuing threat aggravating circumstance. The instruction as given reads as follows:

You are instructed that the term probability of future acts of violence which would constitute a continuing threat to society is appropriate when you find beyond a reasonable doubt that because of

---

5. Besides the papier-maché gun and lighter, the State introduced evidence of appellant's murder conviction in Kay County, two prior armed robberies, and his threats to the prosecuting attorney in the Kay County murder case.

6. In his brief, appellant states that the improper instruction was number twenty-nine. A review of the record reflects that the instruction he complains about is number five.

the background of violent activities in the defendant's past there is a strong probability or strong likelihood that the defendant may commit criminal acts of violence. In making this determination, you may look at the defendant's attitude toward law enforcement officers, whether or not the defendant caused trouble while in jail on this offense, other acts of violence committed by this defendant, and any other reasonable basis in the evidence which may help you determine probability. The mere fact that you found the defendant guilty of this crime absent other circumstances will not support a finding of this aggravating circumstance.

Initially, we note that appellant did not object to this instruction at trial. We find that the trial court did not err in giving this instruction. If anything, this instruction required the jury to make a more specific finding of the evidence that would warrant the aggravating circumstance. The instructions as a whole adequately stated the applicable law for the jury to apply to the facts of the case. *See Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368, 373 (1973) ("[W]e accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.") We find no error in the giving of this instruction.

■■■ Appellant argues in his seventeenth assignment, that a few instances of prosecutorial misconduct deprived him of a fair trial. First, he contends that the prosecutor attempted to define reasonable doubt for the jury, and second that the prosecutor appealed to the jury's sympathy for the victim. It is error for a prosecutor to define or attempt to define the term "reasonable doubt" for the jury. *Vaughn v. State*, 697 P.2d 963, 967 (Okl.Cr.1985); *See also Gresham v. State*, 396 P.2d 374, 376 (Okl.Cr.1964). However, it is only prejudicial error requiring reversal of a conviction when it is coupled with other improper remarks by the prosecutor. *Gresham*, at 376.

■■■ Appellant did object to the prosecutor's alleged attempt at defining reasonable doubt which was overruled by the trial court. During the individual voir dire of one potential juror, the following exchange occurred:

(BY THE STATE): . . . Could you make such a logical sequence and feel comfortable about making a decision if there was enough evidence to satisfy you?

(POTENTIAL JUROR): Yeah, I would presume that it rained, unless I found a broken fire hydrant, or something out of the ordinary.

Q: In all fairness. I suppose my neighbor could have come over with a garden hose and stood out there for hours and wet everything down. But in my illustration to you, the facts that I had,—that wasn't there. All kinds of probabilities, and you look at that probability with a test of reasonableness. Will you be reasonable in this case, Mr. Jones?

(Tr. 539). (Emphasis added). Appellant complains that the highlighted portion is the prosecutor's attempt at defining reasonable doubt for the jury. We do not find that this was an attempt at defining reasonable doubt. Even if this did amount to an attempt at defining reasonable doubt, voir dire was done individually, not before the entire jury panel, and Mr. Jones was excused by the trial court from serving on the jury in this case. We do not see how appellant was prejudiced by the remark. *See Vaughn v. State*, 697 P.2d 963 (Okl.Cr. 1985).

■■■ It is also error for a prosecutor to make comments with the effect of arousing the passions and sympathies of the jury for the victim. Appellant argues that the prosecutor made such comments in his closing arguments for the first and second stages of the trial. However, neither of the comments were objected to at trial, therefore, we can only review for fundamental error. *Trim v. State*, 808 P.2d 697, 699–700 (Okl.Cr.1991). The prosecutor made the following comments:

... This woman's position of you are not going to get away with this has deteriorated down to begging for the rest of her

property down to sobbing about "Are you going to rape me? Are you going to kill me?" And we hear from Mr. Castro that on her knees, partially nude, she was crying, she was asking, "Are you going to rape me? Are you going to kill me?" You can imagine the anguish in that woman's mind at that time. And then he fires that gun into her head. And that's not where it stopped. John Walter Castro walks up there and sees her eyes, and in his words, dead, but not dead, or paralyzed, but her eyes looking up at me; I shot her two or three more times, and it was over. She lay there after that initial shot, she languished, and then this man pumps two or three more into her head, and she died....
(Tr. 3638–39) (closing argument from first stage).

... But you know, there are other constitutional rights, too. The State has failed in those constitutional rights. There was no one out there bending over Beulah Cox's body whispering into her ear, hey, you have got some constitutional rights: life, liberty, the pursuit of happiness. She had rights. So did Mrs. Pappan. [the murder victim from Kay County]
(Tr. 3788) (closing argument from second stage). While we do not condone the making of such comments, they are not so egregious as to amount to fundamental error that would require reversal or modification of appellant's convictions and sentences. *Langley v. State*, 813 P.2d 526, 531 (Okl.Cr.1991). We find that the comments appellant complains of in this assignment did not deprive appellant of a fair trial. Reversal is not required.

 In his eighteenth assignment, appellant argues that the admission of other crimes committed by appellant were prejudicial error requiring reversal of his convictions. The general rule is that if one is to be convicted of an offense as charged, it must be on evidence which shows one guilty of that offense and not on evidence of other crimes that are not connected to

the charged offense. *Burks v. State*, 594 P.2d 771 (Okl.Cr.1979), *overruled in part on other grounds, Jones v. State*, 772 P.2d 922 (Okl.Cr.1989). Appellant contends that the State introduced evidence that appellant smoked marijuana, escaped from jail, and was responsible for Ms. DeNoya's miscarriage. We find no error. In the first place, the three instances appellant complains of all occurred during cross-examination by the State of defense witnesses. During the State's cross-examination of Sandra Castro, the prosecutor was asking her if she was ever around appellant when he had been smoking marijuana. She replied that she had and that he acted "happy", but never crazy. (Tr. 3463–64). This directly refuted the defense's contention that appellant was intoxicated on marijuana at the time he shot the decedent and his defense of not guilty by reason of insanity. Even if this were inadmissible evidence of other crimes, we find that it is harmless in light of the substantial evidence against appellant.

 During the State's cross-examination of Patti DeNoya, the prosecutor asked her about a miscarriage. (Tr. 3329). The prosecutor asked when it happened, to which the defense objected. The prosecutor later withdrew the question and the judge admonished the jury to disregard the reference. (Tr. 3294). Appellant now contends that the prosecutor's intent was to imply to the jury that appellant was responsible for the miscarriage. Besides the fact that this does not imply a crime per se, any possible error was cured by the judge's admonishment to the jury.

 Also, during the State's cross-examination of Ms. DeNoya, she inadvertently mentioned that appellant had escaped from jail since this crime was committed. (Tr. 3326). No mention was made of why appellant was in jail, and the judge did sustain defense counsel's objection as the answer given was unresponsive.[7] The judge then admonished the jury to disregard the statement as not being proper

---

7. Defense counsel had argued that her response was an evidentiary harpoon. This ground for

the objection was overruled.

evidence for them to consider. (Tr. 3331). We find no error that would warrant reversal of appellant's convictions.

In his nineteenth assignment, appellant contends that the jury selected did not represent a fair and impartial cross-section of the community because potential jurors were excluded solely because they were opposed to capital punishment. We have adopted the United States Supreme Court's decision in *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), which rejected such a position. *See Castro v. State*, 745 P.2d 394, 400 (Okl.Cr. 1987), *cert. denied*, 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988); *VanWoundenberg v. State*, 720 P.2d 328 (Okl.Cr. 1986), *cert. denied*, 479 U.S. 956, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986). Reversal is not required.

In his twentieth assignment, appellant argues that the death penalty statute and the two aggravating circumstances charged against him in particular, are constitutionally overbroad as applied. This Court has consistently upheld the constitutionality of the death penalty statute and the aggravating circumstances of continuing threat and avoiding arrest or prosecution. *See Castro v. State*, 745 P.2d 394 (Okl.Cr.1987); *VanWoundenberg v. State*, 720 P.2d 328 (Okl.Cr.1986), *cert. denied*, 479 U.S. 956, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986); *Banks v. State*, 701 P.2d 418 (Okl. Cr.1985) *cert. denied* — U.S. —, 112 S.Ct. 883, 116 L.Ed.2d 787 (1992); *Jones v. State*, 660 P.2d 634 (Okl.Cr.1983). This assignment is denied.

In his twenty-first assignment, appellant contends that the trial court erred in failing to provide funds to hire an investigator to assist in interviewing the State's witnesses in preparation for trial. Appellant argues that *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), requires that his motion for an investigator should have been granted because it was a "basic tool" of his defense, therefore his convictions must be reversed. However, for *Ake* to apply in any case, the defendant must make a sufficient showing that such a person is necessary to prepare an adequate defense. There does not appear to be a great risk of error in the proceeding by denying appellant's request for this investigator. While appellant's attorney may have had a large list of witnesses to interview before trial, this alone is not sufficient to meet the requirements of *Ake v. Oklahoma*. This assignment is denied.

Appellant asserts in his twenty-second assignment that his convictions must be reversed because of a violation of the double jeopardy clause of both the Oklahoma and United States Constitutions. In determining whether the double jeopardy clause has been violated, "the applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether they are two offenses or only one, is whether each requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932). In *Brecheen v. State*, 732 P.2d 889, 899 (Okl.Cr.1987) *cert. denied* 485 U.S. 909, 108 S.Ct. 1085, 99 L.Ed.2d 244 (1988), this Court held that the defendant's convictions of both burglary and first degree murder that arose out of the same transaction, did not violate the double jeopardy clause. Likewise, in this case, we find that the offenses of First Degree Murder and Larceny of an Automobile are separate and distinct. Therefore, there is no violation of the double jeopardy clause of either the Oklahoma or United States Constitutions. This assignment is denied.

In his first supplemental brief, appellant contends that the jury was improperly instructed to disregard the influence of sympathy and sentiment in its deliberations and therefore his death sentence should be vacated, to which he cites *Parks v. Brown*, 860 F.2d 1545 (10th Cir.1988). Since appellant filed his brief, the United States Supreme Court has reversed the holding in *Parks v. Brown* on this issue in *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). This Court has also recently rejected a similar argu-

ment. *Stiles v. State*, 829 P.2d 984 (Okl. Cr.1992). Therefore, vacation of appellant's death sentence is not required.

 Finally, in a second supplemental brief, appellant contends that his right to an individualized sentencing proceeding and to meaningful appellate review were denied him by instructions issued in the second stage of trial. Appellant cites *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), to support his contention that his death sentence must be vacated because there is a possibility that one juror may have misinterpreted the second stage instructions as restricting or precluding full consideration of all proffered mitigation and that failure to require the jury to put in writing those circumstances it found to be mitigating, prevents a meaningful appellate review, in this a reweighing state.

However, this Court has recently held that *Mills* is not applicable under Oklahoma law. *Stiles v. State*, 829 P.2d at 997. In the case at bar, the jury was not instructed that it must unanimously agree on the mitigating circumstances. We also find that to require the jury to memorialize that which it considers to be mitigation would run afoul of *Mills;* a reasonable juror could interpret that requirement to be that each mitigating circumstance had to be unanimous as is required for the aggravators. Therefore, vacation of appellant's death sentence is not required.

## MANDATORY SENTENCE REVIEW

Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of an aggravating circumstance as enumerated in 21 O.S.1991, § 701.12. Having review the record, we find that appellant was afforded a fair trial—maybe not a perfect one, but a fair one and that the jury was not influenced by passion, prejudice, or any other arbitrary

factor contrary to section 701.13(C). The evidence supports his convictions of First Degree Murder and Larceny of an Automobile. There was sufficient evidence to support the aggravating circumstance of continuing threat to society. And the instructions adequately stated the applicable law in both the first and second stages. We find no reason to reverse, vacate or modify appellant's convictions or sentences. Therefore appellant's convictions of First Degree Murder and Larceny of an Automobile and his sentences of death and twenty years are hereby AFFIRMED.

LANE, P.J., LUMPKIN, V.P.J., and ADAMS,[8] J., concur.

PARKS, J., concurs in results.

PARKS, Judge, concurring in results:

I find that the second stage jury instructions were in accord with *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). I am not prepared to state that *Mills* is inapplicable per se in Oklahoma, nor do I find that this Court made such a determination in *Stiles. See Majority* at 176.

---

**8.** Judge Charles Johnson recused from this case. The Honorable Steven J. Adams, District Judge in the Twelveth Judicial District, was assigned to sit on the Court of Criminal Appeals in this matter in lieu of Judge Johnson.